**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**DWAYNE TAYLOR,**<br><br>**Defendant.** | **Case No. 25-cr-216 (JMC)** |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

On August 8, 1994, Defendant Dwayne Taylor and William C. Jolly murdered Keith Moore. The defendants called a cab, driven by Mr. Moore. At gunpoint, the defendants robbed Mr. Moore of his money, forced him out of the vehicle, and ordered him to lie down in the parking lot. As Mr. Moore lay down next to his cab, one of the defendants shot him three times in the back of the head. Less than five years after his release from a 27-year prison sentence, the defendant brought a loaded revolver into a busy D.C. government building. For the following reasons, the government respectfully requests that the Court impose a sentence of **30 months of imprisonment**, followed by three years of supervised release.

## I. BACKGROUND

*The Offense*

On June 30, 2025, at approximately 9:03 AM, Metropolitan Police Department (MPD) Sixth District Officer Selena Walker ("Officer Walker") responded to a call that an individual had a gun in their bag at the Minnesota – Benning Government Center located at 4058 Minnesota Avenue NE, Washington, DC 20019. The Minnesota – Benning Government Center, a facility where people go to seek employment and evaluate their children for their special education needs, is a gun free zone pursuant to D.C. Code § 22-4502.01.

Officer Walker approached a security official (C1) in the building, who pointed to Defendant Dwayne Taylor as the man who had the gun in his bag.

Officer Walker asked Taylor, "What's going on?" Taylor replied, "My weapon in my backpack." Officer Walker asked Taylor if he had a permit, Taylor stated, "No it's at home, I don't got none of my stuff with me . . . I forgot when I was rushing out the door this morning. I forgot. I just put it in my bag and ran out the door." Officer Walker asked for Taylor's ID. While examining Taylor's ID, Officer Walker asked Taylor if he was licensed to carry. Taylor responded, "No, I'm not licensed to carry." Officer Walker then placed Taylor in handcuffs and called for more officers to come on scene.

Officer Walker asked C1 where the weapon was, and C1 stated that it was in a bag in the x-ray machine. *See* Figure 1. Officer Walker and Officer Darneika Resper ("Officer Resper") then searched the bag for the weapon. Officer Resper recovered a revolver from the front pocket of the backpack. *See* Figure 2.



***Figure 1: X-ray photo of TAYLOR's bag with the revolver (circled in yellow).***




***Figure 2: Snapshot from Officer Resper's body worn camera of her pulling the revolver out of the front pocket of the backpack (circled in yellow).***

The firearm was later determined to be a Hopkins & Allen 36 .38 Special Revolver. The revolver was loaded with five rounds in the five round capacity cylinder. No serial number was found on the gun due to rust.

Officers determined that not only did Taylor not have a license to carry a firearm in the District of Columbia, but he also had a prior felony conviction. Indeed, in 1995, the defendant was convicted in D.C. Superior Court case number 1994 FEL 007863 of (1) Second Degree Murder While Armed; (2) Armed Robbery; and (3) Possession of a Firearm during a Crime of Violence.

Taylor was sentenced to 15 years to life imprisonment for the Second-Degree Murder while Armed conviction. Taylor was released in 2021 after serving approximately 27 years of his sentence. Accordingly, Taylor was aware that he was previously convicted of a crime punishable by a term of imprisonment exceeding one year at the time he was possessing the firearm and ammunition.

*Procedural History*

On July 1, 2025, a complaint was filed in the Superior Court of the District of Columbia, charging Taylor with Unlawful Possession of a Firearm (Prior Conviction) and Carrying a Pistol without a License (Outside Home or Place of Business) in case number 2025 CF2 007366. A Presentment hearing was held on July 3, 2025. The Court ordered Taylor preventively detained pursuant to D.C. Code § 23-1322(b). On July 3, 2025, Taylor waived his preliminary hearing, and the Court found that he had not rebutted the presumption to hold him, and ordered him detained pending trial under D.C. Code § 23-1322(c).

On July 3, 2025, a federal criminal complaint was issued for the defendant, charging him with Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). On July 9, 2025, at the defendant's initial appearance, the government orally moved for detention pending trial. On July 10, 2025, Magistrate Judge Harvey held argument on the government's motion, and ordered the defendant detained pending trial. The defendant appealed Judge Harvey's detention decision. On July 15, 2025, Chief Judge Boasberg affirmed Judge Harvey's decision.

On September 2, 2025, the defendant pleaded guilty before this Court to Count One of the Information, Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). (ECF No.

21). As part of the agreement, the government agreed to cap its allocution within the applicable guideline range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). (ECF No. 21 at 4). The government and the defendant agreed that under U.S.S.G. §2K2.1(a)(4)(A), the defendant's Base Offense Level is 20. (ECF No. 21 at 2). As the defendant accepted responsibility and provided timely notice of his intent to enter a guilty plea, the government and the defendant agreed that the defendant is entitled to a 3-level reduction under U.S.S.G. §3E1.1. (ECF No. 21 at 3). Accordingly, the Final Offense Level is 17. (ECF No. 21 at 3).

Sentencing is scheduled for Thursday, January 8, 2026, at 11:00 AM.

## II. LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> (i) issued by the Sentencing Commission . . .; and
> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
> (A) issued by the Sentencing Commission . . . and
> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.*at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See*

*United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## III. SENTENCING GUIDELINES CALCULATION

### A. The Defendant's Final Offense Level is 17.

The base offense level for the defendant is 20 under U.S.S.G. §2K2.1(a)(4)(A), because, as discussed more fully below, he possessed the firearm subsequent to a conviction for a crime of violence.

### B. The Defendant's Criminal History Category is II, and His Guideline Range Is Thus 27 to 33 Months' Imprisonment.

The government concurs with Probation's assessment of the defendant's criminal history, as set out in the Presentence Investigation Report (PSR). As shown in the table below, the defendant's total criminal history score is three (3), establishing a Criminal History Category of II.

With a Criminal History Category of II and a Final Offense Level of 17, the defendant's Guideline range is 27-33 months' imprisonment.

| Docket | Charge | Sentencing Date | Sentence | Points |
|---|---|---|---|---|
| 1994 FEL 007863 | Second Degree Murder While Armed; Armed Robbery; Possession of a Firearm During a Crime of Violence | 12/8/1995 (arrest 8/16/1994) | 15 years to Life; 10 to 30 years; five to 15 years | 3 (§4A.1.(a)) |

## IV. THE GOVERNMENT'S SENTENCING RECOMMENDATION

### A. The Nature and Circumstances of Mr. Taylor's Offense.

Mr. Taylor pleaded guilty to carrying a loaded firearm. Although this offense is possessory in nature, this Court has warned against discounting the inherent danger associated with loaded firearms. "Illegally possessing a fully loaded concealed firearm with easy, quick access in the front waistband of defendant's pants, while out in public, poses an inherent risk of danger to the community." *Blackson*, 2023 WL 1778194, at *7. This is particularly the case because the revolver recovered from Mr. Taylor's person at the time of his arrest was fully loaded and ready to fire. *See United States v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020), *aff'd* (Nov. 5, 2020) (finding that a defendant should be detained pretrial in part because "the firearm recovered from the Defendant's person had a round already chambered, making the circumstances even more troubling."). Congress recently indicated how seriously these offenses should be taken when it increased maximum sentences for 18 U.S.C. 922(g) from 10 years to 15 years.

Further, arguments concerning "mere possession" ignore the scourge of gun violence in our community. A loaded firearm is a deadly weapon. It has the ability with a single pull of the action to end a life. A firearm can escalate a mundane disagreement or a petty offense into a deadly encounter. And the reason law enforcement targets the illegal possession of firearms prior to the commission of a crime is because once an individual makes the decision to produce a firearm and pull the trigger, law enforcement is powerless to intervene.

In this instance, the defendant, a convicted murderer, brought a loaded revolver into a D.C. government building – a gun free zone. Notably, the Minnesota-Benning Government Center

houses a satellite evaluation center for the DC Public Schools program to evaluate children with special needs called "Early Stages" and is across the street from the Friendship Collegiate Academy Public Charter School.[1] *See* Figure 3. That the defendant would possess this weapon in a D.C. government building and within the close vicinity of a public school demonstrates a heightened risk to the community.




***Figure 3: Map of the Minnesota Benning Government Center (circled in red) and the Friendship Collegiate School circled in black.***

In sum, this was a dangerous offense justifying a 30-month term of incarceration.

[1] Early Stages is a free program of D.C. Public schools that identifies delays and disabilities in children aged 2 years 8 months to 5 years 10 months that may impact their education. *See* https://www.earlystagesdc.org/.

**B. The History and Characteristics of the Defendant**

The defendant's unlawful possession of a firearm in this case is particularly troubling considering his violent criminal history.

On August 8, 1994, at around 9:30 p.m., Taylor and co-defendant William Jolly shot and killed Keith Moore during the course of an armed robbery. *See* Exhibit 1 (Government's Response to Defendant's Motion to Reduce Sentence Pursuant to the Second Look Amendment Act D.C. Code § 24-403.03). Each armed with a handgun, the two men went to the lobby of 2300 Good Hope Road, SE, where the defendant called a Yellow Cab from the receptionist booth. *Id.* Two witnesses, including an off-duty MPD officer who knew Jolly, observed the defendants waiting in the parking lot for the cab to arrive. *Id.* Shortly thereafter, Keith Moore, who drove for Yellow Cab, arrived at the destination and picked up the two defendants. *Id.* Mr. Moore drove the two defendants to the 2600 block of Douglas Road. *Id.* When he stopped the cab to let them out, the defendants put a gun to his head and demanded money from him. Mr. Moore gave his money to the defendants. *Id.* The defendants then instructed Mr. Moore to get out of his cab and lie down in the parking lot. Mr. Moore complied. *Id.* As he lay on the ground next to his cab, one of the defendants shot him three times in the back of the head. *Id.* Both defendants fled the scene. *Id.* At approximately 9:45, p.m., MPD officers arrived at the scene of the shooting and observed Mr. Moore lying in the parking lot next to his cab suffering from gunshot wounds to the head. Mr. Moore's cab was still running, and its headlights were on. *Id.* Shell casings were found on the pavement next to Mr. Moore's body. Mr. Moore was taken to D.C. General Hospital where he was pronounced dead. Officers later learned that Mr. Moore had been robbed of his money, a black fanny pack that he wore on his hip, and his beeper. *Id.*

Immediately after the shooting, witnesses observed the defendants running together away from the cab. *Id.* The defendants jumped over a fence and ran to Taylor's aunt's house on nearby Pomeroy Road. Once inside, the defendants split up the proceeds of the robbery. *Id.* They divided up the cash equally, and the defendant took Mr. Moore's beeper. *Id.* They then went to the woods near the defendant's aunt's house and tried to set fire to Mr. Moore's fanny pack. *Id.*

On the weekend of August 13, 1994, the defendant learned that homicide detectives wanted to speak to him about the murder of Mr. Moore. *Id.* The defendant's cousin, MPD Officer Yeldell-Carter accompanied the defendant to the Homicide Branch on August 15, 1994, where he turned himself in to the police. *Id.* The defendant waived his rights and agreed to give a videotaped statement to the detectives. *Id.* The defendant acknowledged being with co-defendant Jolly on the evening of the murder and stated that he and Jolly planned on robbing someone that evening. *Id.* The defendant denied that they intended to kill Mr. Moore. *Id.*

On September 21, 1994, a Superior Court Grand Jury returned an indictment charging the defendants with First-Degree (Felony) Murder while Armed, Armed Robbery, Possession of a Firearm During a Crime of Violence ("PFCV") and Carrying a Pistol without a License. *Id.*

On June 19, 1995, Taylor pled guilty to second-degree Murder While Armed, Armed Robbery, and PFCV. *Id.* On September 11, 1995, the court sentenced the defendant to concurrent periods of incarceration of 20 years to life imprisonment for second-degree murder while armed and 10 to 30 years for Armed Robbery, and a consecutive sentence of five to 15 years for PFCV. *Id.* Mandatory minimum terms of imprisonment applied to the Armed Robbery and PFCV charges. *Id.* On November 29, 1995, the defendant filed a Motion to Correct an Illegal Sentence and for Resentencing. On December 8, 1995, the court granted Taylor's motion and ordered that the

Judgment and Commitment Order be amended to 15 years to life imprisonment for the second-degree murder while armed conviction. *Id.*

From October 2001 to June 2017, the defendant filed several *pro se* motions to vacate or challenge his sentence. The defendant became eligible for parole on June 10, 2014. On August 17, 2021, the defendant filed through counsel his Motion to Reduce Sentence Pursuant to Second Look Amendment Act. The defendant had served approximately 27 years of his 25 years to life sentence at that point.

The government filed its opposition to the defendant's motion to reduce his sentence on October 18, 2021. The government argued that his 11 disciplinary infractions in custody, failure to engage in therapeutic programming, and minimal expression of remorse demonstrated a lack of maturity and undermined his claim that he was fit to reenter society. *Id.*

The defendant's disciplinary infractions included three Level 100 infractions:[2] possessing drugs/alcohol in 2019, possessing a dangerous weapon in 2012, and possessing a dangerous weapon in 2009. He was also disciplined for two Level 200 infractions: threating bodily harm in 2017 and engaging in sexual acts in 2007; and six Level 300 infractions: twice refusing a work assignment in 2012, and refusing to obey an order in 2020, 2012, 2002, and 2001. *Id.*

The government was particularly concerned with the defendant's inability to accept responsibility for his actions. *Id.* Mr. Moore's family reported that during the defendant's most recent parole hearing, he deflected blame for the killing, and even claimed he tried to stop his co-defendant from shooting Mr. Moore. *Id.* The defendant included in his motion a letter of apology

---

[2] BOP divides prohibited infractions into four categories, with Level 100 prohibited acts classified as the most serious, and level 400 prohibited acts as the least serious. 28 C.F.R. § 541.3.

to Mr. Moore's family, however, his message was undermined by his focus on how the murder impacted his own life. *Id.*

On December 17, 2021, D.C. Superior Court Associate Judge Andrea L. Hertzfeld granted the defendant's motion, sentencing him to time served and five years of supervised release. *See* IRAA Order, 12/17/2021. Judge Hertzfeld focused on the defendant's youth (age 17) at the time of the offense and found that he was adequately remorseful and that his number of infractions was minimal for 27 years of incarceration. *See id*. The defendant's supervised release was closed satisfactorily on February 28, 2025.

Only months after the expiration of his sentence for the cold-blooded murder of a taxi driver, did the defendant decide to bring a loaded revolver into a government building. In the body worn camera, the defendant frequently chastised himself for this action. The defendant knew that what he was doing was wrong, but, just like when he murdered an innocent person, he could not stop himself.

**C. The Need for the Sentence Imposed**

A sentence of 30 months of imprisonment is necessary for specific and general deterrence, as well as public safety. A significant period of incarceration is necessary, as the defendant's past period of incarceration clearly did not deter him from illegally possessing a firearm in this case. This sentence is needed to reinforce for the defendant, that there is no room for poor decision making in the context of carrying illegal firearms. A significant period of incarceration in this case will serve general deterrence, as it will signal to convicted felons that, if they are to illegally possess a firearm in the future, they will face severe consequences. Further, as the defendant illegally carried this firearm into a D.C. government building, there is a substantial public safety

interest in incarcerating the defendant. An accidental discharge or a heated argument could have, once again, resulted in the loss of life. The amplified potential for tragedy is a reason why guns are forbidden from school zones and public places such as this.

As such, this factor weighs in favor of a substantial period of incarceration.

**D. The Need to Avoid Unwarranted Sentencing Disparities**

Although the government's sentencing recommendation is higher than both the average (25 months) and median (27 months) lengths of imprisonment for defendants with a Final Offense Level of 17 and a Criminal History Category of II, the government's recommended sentence – a term of 30 months' imprisonment – is within the Guidelines range and would not result in unwarranted sentencing disparities due to the specific nature of the offense and the defendant's criminal history. (PSR at 17, par. 86).

Although the defendant's criminal history category is only Level II, his scoring offense was one of the most serious crimes one can commit – second degree murder. Notably, that was a murder that was committed through the use of a firearm. His conviction for the gravest of violent crimes, therefore, distinguishes him from other defendants who face sentencing for similar crimes. In this context, the danger posed by the defendant bringing a loaded firearm into a government building cannot be understated, as the building was full of innocent bystanders. As such, a sentence within the middle of the Guidelines range would not result in unwarranted sentencing disparities.

**V. <u>CONCLUSION</u>**

For the foregoing reasons, the government respectfully recommends that the Court sentence Defendant Taylor to a term of 30 months of imprisonment, to be followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: /s/ *David B. Liss*
DAVID B. LISS
Assistant United States Attorney
D.C. Bar No. 90017629
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-680-4025
Email: David.liss2@usdoj.gov